UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

T.G. ON BEHALF OF R.P.,

                      **Plaintiff,**             12 Civ. 6058 (JGK)

       - against -                <u>OPINION AND ORDER</u>

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                      **Defendant.**
————————————————————————————

**JOHN G. KOELTL, District Judge:**

     The plaintiff, T.G., brings this action on behalf of her son, R.P., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et seq.</u>, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 <u>et seq.</u>, and the New York Education Law § 4400 <u>et seq.</u>, and Regulations, against the New York City Department of Education ("the Department"). The plaintiff challenges the decision of the State Review Officer ("SRO") denying her claim for payment of R.P.'s tuition for the Rebecca School, a private school at which R.P. was unilaterally placed for the 2011-2012 school year. The SRO's decision reversed the decision of an Impartial Hearing Officer ("IHO"). The parties have cross-moved for summary judgment on the plaintiff's IDEA claims. The Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A).[1]

For the reasons explained below, the plaintiff's motion for summary judgment on the IDEA claims is **denied** and the defendant's motion for summary judgment on the IDEA claims is **granted**.

## I.

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent. Sch. Dist. ("Gagliardo II"), 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).  A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal citation and quotation marks omitted)).  Because the

---

[1] While both parties sought summary judgment on the entire complaint, the parties only addressed the standards to be applied to the IDEA claims, and therefore summary judgment could not be granted with respect to the remaining claims at this time.

IDEA expresses a "strong preference for children with
disabilities to be educated, 'to the maximum extent
appropriate,' together with their non-disabled peers, special
education and related services must be provided in the least
restrictive setting consistent with a child's needs." Id.
(internal citation omitted); see also D.C. ex rel. E.B. v.
N.Y.C. Dep't of Educ., No. 12 Civ. 1394, 2013 WL 1234864, at *1
(S.D.N.Y. Mar. 26, 2013).

 "To ensure that qualifying children receive a FAPE, a
school district must create an individualized education program
('IEP') for each such child." R.E. v. N.Y.C. Dep't of Educ.,
694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d);
Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195,
197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of
the IDEA system)), cert denied, No. 12-1210, 2013 WL 1418840, at
*1 (June 10, 2013).  The IDEA requires that an IEP be
"reasonably calculated to enable the child to receive
educational benefits." Rowley, 458 U.S. at 207.  In New York,
the responsibility for developing an appropriate IEP for a child
is assigned to a local Committee on Special Education ("CSE").
Walczak, 142 F.3d at 123.  "CSEs are comprised of members
appointed by the local school district's board of education, and
must include the student's parent(s), a regular or special

education teacher, a school board representative, a parent representative, and others." R.E., 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id. (citing Gagliardo II, 489 F.3d at 107-08).

Parents in New York who wish to challenge their child's IEP as insufficient under the IDEA may request an impartial due process hearing before an IHO appointed by the local board of education.  Walczak, 142 F.3d at 123 (citing 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)).  A party may appeal the decision of the IHO to an SRO, and the SRO's decision may be challenged in either state or federal court.  Id. (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y. Educ. Law § 4404(2)). In addition, if a school district fails to provide a FAPE to a child with disabilities, the child's parents may, at their own financial risk, remove the child from the improper placement, enroll the child in an appropriate private school, and retroactively seek reimbursement for the cost of private school from the state.  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985); see also D.C., 2013 WL 1234864, at *2.

Under the IDEA, a district court must conduct an independent review of the administrative record, along with any

additional evidence presented by the parties, and must determine

by a preponderance of the evidence whether the IDEA's provisions

have been met.[2]  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d

377, 380-81 (2d Cir. 2003); see also Gagliardo II, 489 F.3d at

112.  This independent review, however, is "by no means an

invitation to the courts to substitute their own notions of

sound educational policy for those of the school authorities

which they review."  Rowley, 458 U.S. at 206.

The Second Circuit Court of Appeals has explained that "the

standard for reviewing administrative determinations 'requires a

more critical appraisal of the agency determination than clear-

error review . . . but . . . nevertheless[] falls well short of

complete de novo review. . . . [I]n the course of th[is]

oversight, the persuasiveness of a particular administrative

finding, or the lack thereof, is likely to tell the tale.'"

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012)

---

[2] The Second Circuit Court of Appeals has noted that, "Summary
judgment in the IDEA context . . . is only a pragmatic
procedural mechanism for reviewing administrative decisions."
M.W. ex rel. S.W. v. New York City Dep't of Educ., -- F. 3d --,
2013 WL 3868594, at *4 (2d Cir. 2013) (internal citation and
quotation marks omitted).  But that "[t]he inquiry . . . is not
directed to discerning whether there are disputed issues of
fact, but rather, whether the administrative record, together
with any additional evidence, establishes that there has been
compliance with IDEA's processes and that the child's
educational needs have been appropriately addressed."  Wall v.
Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y.
1996); see also D.C., 2013 WL 1234864, at *2 n.2.

(quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87
(1st Cir. 1993)).  "[T]he district court's analysis will hinge
on the kinds of considerations that normally determine whether
any particular judgment is persuasive, for example whether the
decision being reviewed is well-reasoned, and whether it was
based on substantially greater familiarity with the evidence and
the witnesses than the reviewing court.  But the district
court's determination of the persuasiveness of an administrative
finding must also be colored by an accute [sic] awareness of
institutional competence and role."  Id.; see M.W., 2013 WL
3868594, at *4.

     The Court of Appeals has also explained that "federal
courts reviewing administrative decisions must give 'due weight'
to these proceedings, mindful that the judiciary generally
'lack[s] the specialized knowledge and experience necessary to
resolve persistent and difficult questions of educational
policy.'"  Gagliardo II, 489 F.3d at 113 (quoting Rowley, 458
U.S. at 206, 208); see also Cerra v. Pawling Cent. Sch. Dist.,
427 F.3d 186, 191 (2d Cir. 2005).  Deference to the decision in
the administrative record is particularly appropriate when the
administrative officers' review has been thorough and careful,
and when the court's decision is based solely on the
administrative record.  See Walczak, 142 F.3d at 129; Frank G.

6

v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006).  When, as in
this case, "an IHO and SRO reach conflicting conclusions, we
defer to the final decision of the state authorities, that is,
the SRO's decision."  M.W., 2013 WL 3868594, at *4 (internal
citation and quotation marks omitted).  However, the amount of
deference to an SRO's determination "depends on the quality of
that opinion."  Id. (internal citation and quotation marks
omitted).

## II.

The following facts and procedural background are taken
from the administrative record and the submissions of the
parties.  The facts are undisputed unless otherwise noted.

### A. IEP AND PLACEMENT

T.G. is the parent of R.P., a child diagnosed with high
functioning autism.  (Pl.'s R. 56.1 Stmt. ¶ 4; Def.'s Objs. &
Resps. to Pl.'s R. 56.1 Stmt. ("Def.'s R. 56.1 Resp.") ¶ 4.)
R.P. was born on September 15, 2001, and was approximately ten
years old at the time of the 2011-2012 school year at issue in
this case.  (Pl.'s R. 56.1 Stmt. ¶ 3; Def.'s R. 56.1 Resp. ¶ 3;
IHO Finding of Facts & Decision ("IHO Op.") at 20.)

7

R.P. was born in Texas.  (Ex. 7 at 1.)[3]  In 2003, R.P. and his mother moved to New York City.  (Ex. 7 at 1.)  In 2006, after attending several different schools in New York, R.P. and T.G. moved back to Texas.  (Ex. 7 at 2; Pl.'s R. 56.1 Stmt. ¶ 17; Def.'s R. 56.1 Resp. ¶ 17.)  After poor experiences with the educational opportunities for R.P. in Texas, T.G. and R.P. moved back to New York in 2009.  (Ex. 7 at 2.)  For the 2009-2010 and 2010-2011 school years, R.P. attended the Rebecca School, a private school in New York City for autistic children.  (Def.'s R. 56.1 Stmt. ¶ 11; Pl.'s Objs. & Resps. to Def.'s R. 56.1 Stmt. ("Pl.'s R. 56.1 Resp.") ¶ 11; Tr. 303, 708-09.)[4]

On April 27, 2011, the Department convened a CSE meeting to develop an IEP for R.P. for the 2011-2012 school year.  (Pl.'s R. 56.1 Stmt. ¶ 30; Def.'s R. 56.1 Resp. ¶ 30.)  Present at the CSE meeting were R.P.'s mother, T.G.; Feng Ye, a special education teacher and the district representative; Rose Fochetta, a district school psychologist; Carmen Garcia, a parent representative; Mandy Zoffness, a social worker from the Rebecca School; Carter Swope, R.P.'s special education teacher

---

[3] Exhibits with numbers refer to the defendant's exhibit appendix.  Exhibits with letters refer to the plaintiff's exhibit appendix.  Both appendices were submitted to the SRO.  Neither party challenges the authenticity of the exhibits.

[4] "Tr." refers to the transcript of the impartial hearing before the IHO.

from the Rebecca School (by telephone); and Tom Feole, a parent
representative from R.P.'s attorney's office.  (Def.'s R. 56.1
Stmt. ¶ 27; Pl.'s R. 56.1 Resp. ¶ 27; Tr. 30-31.)

The CSE was provided with several sources of information
with which to formulate R.P.'s 2011-2012 IEP,[5] a classroom
observation report from November 2010 by Feng Ye, a Rebecca
School progress report from December 2010, a clinical interview
evaluation performed on January 11, 2010 by Rose Fochetta, an
initial psychosocial history report conducted in December 2009
by Michelina Leone-Flick, and a psychoeducational evaluation
from September 2009 by Dr. Beryl Nightingale.  (Exs. A, 4-8; Tr.
32, 99-100.)

In November 2010, Feng Ye, a special education teacher and
district representative at the CSE, observed R.P. for
approximately thirty minutes at the Rebecca School.  (Ex. 4.)
Feng Ye's report on this observation concluded that "[R.P.] was
seen to be able to follow directions and was responsive to
redirection.  Although he participated in group discussion, he
sometimes appeared to be inattentive.  He was very verbal and

_____

[5] The Department had formulated an IEP for the 2010-2011 school
year.  R.P.'s IEP for the 2010-2011 school year called for R.P.
to be placed in a 12:1:1 class for a 10-month school year.  (Ex.
A at 1.)  The parent and the Department reached settlements for
the 2009-2010 and 2010-2011 school years that kept R.P. at the
Rebecca School with tuition paid for by the Department.
(Tr. 303, 708-09.)

was able to give a narrative in sequence. . . . He displayed potential to achieve academically.  No disruptive behaviors were seen in this observation."  (Ex. 4 at 2.)  The report made no specific recommendations for R.P.

The Rebecca School provided the CSE with a progress report dated December 2010.  (See Ex. 5.)  Over the 2010-2011 year at the Rebecca School, R.P. had been in a classroom with seven other students, one head teacher, and three assistant teachers ("8:1:3").  (Ex. 5 at 1.)  R.P. received one session of 1:1 occupational therapy and two sessions of group occupational therapy each week.  (Ex. 5 at 7.)  R.P. also received two group sessions of speech and language therapy per week.  (Ex. 5 at 9.) The progress report stated that R.P. "is attentive to those around him[,]" "is able to attend easily to all activities when regulated and interested[,]" and "transitions easily to activities within the classroom and outside of the classroom with the assistance of a visual schedule (written) and verbal reminders . . . ."  (Ex. 5 at 1.)  In the progress report, R.P.'s teacher at the Rebecca School, Carter Swope, detailed R.P.'s education and emotional development levels.  (Ex. 5 at 1-7.)  The progress report made no specific educational placement recommendations for R.P. for the 2011-2012 school year.

10

The CSE also had before it a January 2010 clinical interview conducted by Rose Fochetta, the school psychologist who was present at the CSE meeting.  (Ex. 6.)  Ms. Fochetta's evaluation reflected her impression that R.P.'s play was "very aggressive in nature" and "suggest[ed] that he experiences difficulty navigating social relationships."  (Ex. 6 at 2.)  She concluded that "[o]verall, despite intact cognitive skills and the ability to be verbally engaged, [R.P.] experienced difficulty with reciprocal social interaction if it was not on a preferred topic.  However, when speaking about topics of his interest, he was found to be fully engaged and responsive." (Ex. 6 at 2.)

Michelina Leone-Flick, a social worker, conducted an initial psychosocial history report of R.P. in December 2009. Her report detailed R.P.'s biography and her observations of R.P. but made no specific recommendations for him.  (Ex. 7.)

Dr. Beryl Nightingale observed R.P. over two days in September 2009, interviewed R.P.'s teachers from Texas and the Rebecca School, and conducted tests to analyze R.P.'s intellectual functioning.  (Ex. 8 at 4, 6-7.)  Her evaluation concluded with a series of recommendations, including:

- [R.P.] requires a small, calm, structured classroom setting with teachers specialized in working with children with Autism Spectrum Disorders.  Further an

> explicit social skills curriculum is necessary to address his needs. Moreover, behavioral interventions are recommended to address his aggression and overall difficulty with regulating affect.
>
> - [R.P.] should not be placed with other children who have significant behavior problems as this will exacerbate some of these behaviors in him.
> - Given the degree of severity of [R.P.'s] difficulties, he would benefit from a 12 month program to provide him with continued intervention throughout the year to prevent regression over the summer months and provide the continuous consistency and structure that he needs.

(Ex. 8 at 10.)  When it prepared the IEP, the CSE team also relied on the live input at the CSE meeting from T.G. and from Carter Swope, R.P.'s teacher at the Rebecca School.  (Tr. 38-39, 51, 57, 665, 667.)

The IEP was sent to T.G. on May 11, 2011.  (IEP at 2.)  The IEP classified R.P. as autistic and recommended a twelve-month school year.  (IEP at 1.)  Because a twelve-month school year begins over the summer, the IEP projected that it would be initiated on July 1, 2011.  (IEP at 2.)  The CSE concluded that R.P. should be placed in a specialized class in a specialized school with a student/teacher/paraprofessional ratio of 8:1:1.  (IEP at 1-2.)  The IEP also recommended that because of R.P.'s potential for aggression, R.P. should be provided with a full time 1:1 crisis management paraprofessional.  (IEP at 16, 18.)  The CSE considered and rejected programs with ratios of 12:1:1

12

and 8:1:1 without a crisis management paraprofessional because
it believed they were insufficiently supportive.  (IEP at 16.)
The CSE considered and rejected a program with a ratio of 6:1:1
because it was overly restrictive and the CSE felt that R.P.
could benefit from greater peer and social interaction.  (IEP at
16.)  The parent did not vocalize any complaint about the 8:1:1
recommendation at the CSE meeting.  (Tr. 660.)

The IEP also included recommendations for related services.
The IEP recommended that R.P. be provided 1:1 occupational
therapy three times per week for thirty minutes, 1:1 counseling
four times per week for thirty minutes, 2:1 counseling once per
week for thirty minutes, and 2:1 speech therapy twice each week
for thirty minutes.  (IEP at 17.)

Because of R.P's behavioral issues, the IEP included a
Behavior Intervention Plan ("BIP").  The BIP explained that R.P.
may swear, yell, and scream when frustrated, may react
explosively to situations, and that R.P. sometimes speaks about
hurting himself and others and "may become aggressive toward
others." (IEP at 18.)  The BIP stated that counseling, speech
and language therapy, occupational therapy, a special education
teacher, and the 1:1 full time crisis management
paraprofessional would all act as support to help R.P. change

13

his behavior.  (IEP at 18.)[6]  None of the participants at the CSE vocalized any disagreement with the BIP.  (Tr. 679-80.)  The 2011-2012 IEP did not contain a Functional Behavior Assessment ("FBA") and the CSE did not perform an FBA.  (SRO Op. at 16; Tr. 115, 303-04.)

On or about May 31, 2011, not having received a placement letter after the CSE meeting, T.G. sent a letter to the DOE requesting that the DOE inform her of the recommended placement for R.P.  (Ex. F.)  In the letter, T.G. explained that the Rebecca School required the parent to sign a contract and make a deposit of $1,500.00 for the 2011-2012 school year.  (Ex. F.)  T.G. stated that she intended to sign the contract to assure R.P. a place at the Rebecca School in case the Department failed to offer R.P. an appropriate placement.  (Ex. F.)  The letter concluded that "[i]f an appropriate program and/or placement is offered . . . I will enroll my child in such program/placement. If an appropriate program/placement is not offered, it is my intention to send my child to the Rebecca School and seek tuition reimbursement, at public expense . . . ."  (Ex. F.)

On June 1, 2011, T.G. signed a contract for R.P. to attend the Rebecca School for the 2011-2012 school year and paid $1,000

---

[6] The 2011 BIP is identical to the 2010 BIP developed for R.P. with the exception of one sentence added to the 2011 BIP section on strategies for changing behavior.  (IEP at 18; Ex. A at 18.)

14

of the $1,500 non-refundable deposit to the school.  (Exs. K, L.)  The contract with the Rebecca School provided that T.G. could be released from the contract and would be refunded any tuition paid to the Rebecca School (except for the security deposit) if she provided written notice by September 7, 2011, that R.P. had been enrolled in a class or school recommended by the Department in accordance with an IEP prepared by a CSE. (Def.'s R. 56.1 Stmt. ¶ 67; Pl.'s R. 56.1 Resp. ¶ 67; Ex. K at ¶5(c).)

On June 8, 2011, the Department mailed T.G. a final notice of recommendation ("FNR") offering R.P. a classroom placement at P169 @ P155M ("P155M") that allegedly provided the services listed in the IEP.[7]  (Ex. G.)  The FNR stated "[y]ou have the right to visit this site.  If you would like to arrange a site visit, please contact [Martin Bassis,]" whose contact information was provided.  (Ex. G.)  The FNR also stated that "[i]f we do not hear from you within 10 days of the date of this letter, the recommended services will be put into effect."  (Ex. G.)  T.G. represents that she received the June 8 letter on June 13, 2012.  (Tr. 310.)

---

[7] P155M is a specialized school located at 319 East 117th Street in Manhattan, predominantly on the fourth floor of a general education school.  The cafeteria is on the first floor and the gym is on the second floor.  (Def.'s R. 56.1 Stmt. ¶ 53; Pl.'s R. 56.1 Resp. ¶ 53.)

After receipt of the FNR, T.G. made numerous attempts to contact the proposed placement school at P155M to schedule a visit.  (Tr. 310-11.)  Her phone calls were not returned.  (Tr. 310-11.)[8]  On June 21, 2011, T.G. wrote a letter to Martin Bassis, the contact person listed in the FNR, explaining that she had not been able to schedule a visit to P155M:

> I still have not received a call back from the Parent Coordinator to schedule a visit.  I am at a complete loss as to what to do.  I feel as if I can neither accept or reject the recommended placement without an opportunity to view it and determine if the recommendation is appropriate. . . . [R.P.'s] start date of July 5th [] is alarmingly close.  I am getting quite frantic at this point regarding the lack of response to my requests to view the school.  I honestly don't know what to do.  Can you please advise me on how to proceed.  I am eager to consider any recommendations made by the CSE but I need to be able to view them first.  I am afraid that if an appropriate program/placement is not offered in a timely manner for the 2011-2012 school year . . . I will have no choice but to unilaterally place [R.P.] at the Rebecca School and seek reimbursement for this placement at the public expense.

(Ex. H.)  T.G. received no response to this letter.

On June 24, 2011, T.G. paid the Rebecca School the final $500 toward her nonrefundable deposit to reserve R.P.'s seat for the 2011-2012 school year.  (Ex. L at 1, 3; SRO Op. at 3.)  On

---

[8] At oral argument, the Department stipulated that it is not contesting the truthfulness of the plaintiff's assertion that she attempted to contact the placement to arrange a visit but did not receive any response.  (Hr'g Tr. 31, July 1, 2013)

July 5, 2011, T.G. sent a second letter to Martin Bassis.  (Ex. I.)  The July 5 letter explained that because T.G had received no response to her prior letters and had been unable to visit the proposed placement, she would be unilaterally placing R.P. at the Rebecca School for the 2011-2012 school year and intended to seek tuition reimbursement for the placement.  (Ex. I.)  T.G. subsequently enrolled R.P. at the Rebecca School for the 2011-2012 school year.  (Tr. 358; Pl.'s R. 56.1 Stmt. ¶ 54; Def.'s R. 56.1 Resp. ¶ 54a.)

On July 14, 2011, having never visited P155M, T.G. filed a due process complaint notice requesting an impartial hearing and seeking payment of R.P.'s tuition at the Rebecca School for the 12-month 2011-2012 school year.  (Ex. 9.)  The due process complaint alleged a number of deficiencies with the IEP: (1) the goals and objectives did not meet all of R.P.'s unique educational, social, and emotional needs; (2) the IEP was not reasonably calculated to confer educational benefit on R.P.; (3) the classroom observation was completed too long before the April 2011 CSE meeting; (4) the CSE failed to do any additional testing; (5) the CSE failed to conduct an FBA in order to appropriately and effectively update the BIP; (6) the CSE was not duly constituted; (7) the program recommended by the CSE did not comport with the suggestions and recommendations of those

professional who worked with R.P.; (8) the CSE was unable to provide the parents with information about the proposed program; (9) the 8:1:1 ratio with a 1:1 crisis management paraprofessional was inappropriate for R.P.; (10) the CSE failed to consider other programs available pursuant to the "Continuum of Services" by not discussing a non-public school placement at the Rebecca School; (11) in not considering a more restrictive program, the CSE did not place R.P. in the least restrictive environment based on his educational needs; and (12) the CSE failed to provide R.P. with an appropriate placement for the 2011-2012 school year.  (Ex. 9 at 3-4.)  The due process complaint also alleged generally that "[t]he CSE failed to offer an appropriate program for the 2011-2012 school year."  (Ex. 9 at 5.)

On or about October 7, 2011, T.G. alleges that she was finally able to reach the Parent Coordinator at P155M. (Tr. 315-16.)  T.G. alleges that the Parent Coordinator said she would call her back to arrange a visit, but failed to do so. (Tr. 315-16.)  On October 12, 2011, one week before the start of the impartial hearing, T.G. and Lynn Kalvin, a social worker from the Rebecca School, visited P155M unannounced and without an appointment.  (Tr. 313-16, 615; Def.'s R. 56.1 Stmt. ¶ 80; Pl.'s R. 56.1 Resp. ¶ 79.)  During the visit, T.G. encountered

18

the school psychologist, Dr. Scarcella.  T.G. alleges that Dr. Scarcella told her that P155M did not place children diagnosed with autism into 8:1:1 classes.  (Tr. 319, 616-17.)  T.G. also alleges that during the visit to P155M she learned that R.P.'s 8:1:1 class would include emotionally disturbed students and that the school lacked an elevator and R.P. would have to take the stairs.  (Tr. 616-19, 650.)  T.G. did not amend her due process complaint after visiting P155M.

At the Rebecca School, R.P. was assigned to an 8:1:3 class with students from 10 to 15 years of age for the 2011-2012 school year.  (Def.'s R. 56.1 Stmt. ¶ 72; Pl.'s R. 56.1 Resp. ¶ 71.)  R.P. received speech therapy twice per week, counseling twice per week, occupation therapy three times per week, and was not provided with a 1:1 paraprofessional.  (Def.'s R. 56.1 Stmt. ¶ 73; Pl.'s R. 56.1 Resp. ¶ 72.)

### B. DUE PROCESS HEARINGS

An impartial hearing was convened over four nonconsecutive days from October 2011 to January 2012.  (See IHO Op. at 3.)

### 1.

Several of the witnesses that testified at the due process hearing were also present at the CSE meeting.  Ms. Fochetta, a

19

school psychologist that worked for the district, testified
about the events of the CSE meeting.  Ms. Fochetta testified
that prior to the CSE meeting, she had reviewed all of the
documents before the CSE.  (Tr. 32.)  She testified that the
Rebecca School progress report "was definitely relied upon in
detail" by the CSE."  (Tr. 84.)  Ms. Fochetta explained that she
was "familiar with" the September 2009 evaluation by Dr.
Nightingale, had read the entire evaluation prior to the CSE
meeting and that the evaluation "was on the table during the
[CSE] meeting."  (Tr. 87-89.)  She stated that the CSE did not
rely on the Nightingale evaluation but instead used more current
information about R.P.:

> [W]hen we wrote this IEP we were relying mainly on
> information from [Carter Swope], [R.P.'s] teacher,
> [T.G.], and what was happening at that moment.  [The
> Nightingale evaluation] is a good report and I don't
> want to disparage it, but it was . . . from a year and
> a half prior and I think a lot had happened in
> [R.P.'s] life in that time.  So [the CSE] tr[ied] to
> take the most current information in the forefront.
> Again, I was aware of it, but we used what was most
> current.

(Tr. 89.)  She also testified that at the 2010 CSE meeting, the
CSE had incorporated the evaluation of Dr. Nightingale into the
2010-2011 IEP, and that the 2011 CSE used the 2010-2011 IEP to
draft the 2011-2012 IEP.  (Tr. 87, 100.)

Ms. Fochetta testified that the members of the CSE had talked about R.P.'s social and emotional management needs and decided that the IEP should provide that R.P.'s behavior "seriously interferes" with his instruction.  (Tr. 56-57.)  The CSE decided that R.P.'s behavior required the 1:1 crisis management paraprofessional as well as the other related services described in the IEP.  (Tr. 57.)  Ms. Fochetta explained that the CSE had used "the previous [BIP] as the starting point, but [the CSE] also went through [the previous BIP] with [R.P.'s] teacher and his parent to see what had changed since [the CSE] had last met.  In this case, it was a minor change."  (Tr. 138-39; see also Tr. 74-75.)  On cross-examination, Ms. Fochetta explained that although the CSE had not conducted an FBA, the CSE "discussed the functions of his behaviors at the meeting.  They were fairly well understood and they're included in the IEP."  (Tr. 116.)[9]

---

[9] Ms. Fochetta also testified that although R.P. was overweight, she did not think that his obesity was a "mobility limitation" as that term is listed in the IEP.  (Tr. 136-38.)  There was other testimony with respect to R.P.'s ability to use the stairs at P155M and the Rebecca School and the lack of an elevator at P155M.  (Tr. 345, 475-76, 555.)  Because the issue of elevator access and R.P.'s mobility were not raised in the due process complaint, they are not material to the disposition of this case and the testimony on these issues will not be recounted in detail.

21

Ms. Fochetta explained that although R.P.'s prior 2010-2011 IEP had recommended a 10-month school year and a 12:1:1 class ratio, the CSE reached a consensus that R.P. required a 12-month school year and an 8:1:1 ratio for the 2011-2012 school year. (Tr. 37-38.)  She explained that Carter Swope, R.P.'s teacher at the Rebecca School, initially believed R.P. should continue in a 12:1:1 but, over the course of a discussion, Ms. Swope changed her perspective and agreed that an 8:1:1 class was appropriate. (Tr. 38.)  She further testified that the 8:1:1 program with a 12-month school year was appropriate for R.P. because "the classroom is small . . . [and] allows for a lot of structure, but it also allows for socialization with peers."  (Tr. 91.) Ms. Fochetta testified that the 8:1:1 would provide "significant support" and "address [R.P.'s] areas of strength."  (Tr. 91.) She claimed that the CSE ruled out a 6:1:1 because it "was too small in terms of the amount of peers with which [R.P.] can interact."  (Tr. 39.)  She explained the discussion among the members of the CSE:

> Well, we started our discussion with the 12-month school year component.  And at that point I believe . . . there was consensus with regard to that, and so we then rejected all of the 10-month options, all the community school settings.  So, we discussed then . . . as ratios in a 12-month school year, 12:1:1, 8:1:1, and 6:1:1. . . . [Carter Swope] initially suggested 12:1:1, and as we talked more about it we were wondering if that was enough support.

> We ruled out 6:1:1 as too small, meaning not enough
> peers, social interaction.  And, I believe there was a
> consensus with regard to the 8:1:1, with the one on
> one para.

(Tr. 68.)  Ms. Fochetta also explained that the 1:1 crisis

management paraprofessional "works under the special education

teacher in the class . . . and that teacher would determine how

that individual operates . . . ."  (Tr. 110-11.)

On cross-examination, Ms. Fochetta agreed that the CSE did

not discuss the option of allowing R.P. to remain at the Rebecca

School for the 2011-2012 school year.  (Tr. 124-25.)  She

testified that "[the] Rebecca School is not a state-funded

school.  It is not a state-approved school . . . . [M]y

perspective is that [the Rebecca School is] not the most

appropriate environment for [R.P.]"  (Tr. 141-42.)

T.G. also testified at the due process hearing.  T.G.

stated that none of the reports given to the CSE were discussed

or viewed during the CSE meeting, but rather they all just "sat

on the table . . . ."  (Tr. 300.)  T.G. explained that the CSE

"talked [at] length about how [R.P.'s behavior is] a concern and

how much support he needs because of those behavioral

issues . . . ."  (Tr. 302.)  T.G. also testified that the CSE did

not "discuss" placements, but rather, she was given "options" of

6:1:1, 8:1:1, and 12:1:1.  (Tr. 304.)  She explained that she

23

did not believe the 12:1:1 offered sufficient support, but that
the rest of the CSE believed that the 6:1:1 was too restrictive,
and therefore the CSE settled on the 8:1:1 ratio "by default."
(Tr. 305.)  She later testified that "[e]very level was a
discussion" among the CSE members whether it was appropriate for
R.P, although she did not recall much discussion about the
8:1:1.  (Tr. 656-57.)  T.G. stated that she did not object to
the 8:1:1 program at the CSE, but only because she did not know
enough about it.  (Tr. 660, 715.)  T.G. testified that she
participated in the CSE discussions for each aspect of the IEP,
including the discussion of what modifications, if any, should
have been made to R.P.'s BIP for the 2011-2012 school year.
(Tr. 302, 668-80.)

    T.G. claimed that after she received the FNR she called
P155M and a school representative told her that she had to
contact the Parent Coordinator, Amber Velasquez.  (Tr. 310.)
She testified that she unsuccessfully attempted to contact Ms.
Velasquez a number of times over the several days after she
received the FNR.  (Tr. 311.)  T.G. testified that because she
received no response and was unable to visit the school, she
decided to keep R.P. in the Rebecca School.  (Tr. 313.)

    T.G. recounted her eventual visit to P155M with Lynn Kalvin
in October 2010.  (Tr. 316-22, 638-41.)  During the visit, she

Case 1:12-cv-06058-JGK   Document 32   Filed 09/16/13   Page 25 of 58

was allegedly told that the 8:1:1 class was not for students with autism.[10] (Tr. 319.) T.G. testified that after her visit, she did not believe that P155M was appropriate because R.P. would have been in a class with emotionally disturbed students and he needed more support than an 8:1:1 class could provide. (Tr. 650.)

Carter Swope, R.P.'s teacher over the 2010-2011 year at the Rebecca School, testified that in contrast to Ms. Fochetta's testimony that the CSE had reached a consensus, Ms. Swope argued at the CSE meeting that she did not believe that the 8:1:1 class was appropriate for R.P. because historically 8:1:1 classes had students with emotional disturbances and R.P. could not function in a class with students with significant behavioral problems. (Tr. 422, 425, 449.) She also testified that she had objected to the 12:1:1 designation at the CSE meeting because it was too large. (Tr. 450.)

Several witnesses who testified at the due process hearing were not present at the CSE. Shari Wagman, a special education teacher identified as R.P.'s potential instructor had he

---

[10] Lynn Kalvin also testified that Dr. Scarcella at P155M told T.G. that the 8:1:1 class at P155M was not for students with autism. (Tr. 617.) Dr. Scarcella testified that there was only one 8:1:1 class at P155M and that when T.G. visited Dr. Scarcella showed her the 8:1:1 class as well as two 6:1:1 classes. (Tr. 763-64.)

25

attended P155M (Tr. 158-61), testified that the students in her classroom are classified as emotionally disturbed or mentally retarded. (Tr. 163, 187.) She also stated that she would have been able to implement R.P.'s academic management needs as listed in the IEP. (Tr. 190.)

Tina McCourt, the program director at the Rebecca School, testified about the Rebecca School and R.P.'s experiences there. (Tr. 325-344.) She explained that R.P. was enrolled in an 8:1:3 class at the Rebecca School for the 2011-2012 school year, which consists of eight students, one teacher, and three teacher assistants. (Tr. 349.) She also testified that she did not believe the 8:1:1 in the 2011-2012 IEP was an appropriate ratio for R.P. but that the Rebecca School was appropriate. (Tr. 359.)

Dr. Beryl Nightingale, clinical psychologist and author of the 2009 evaluation of R.P., testified that she had not seen R.P. since his 2009 evaluation. (Tr. 499.) Dr. Nightingale testified that she believed the Rebecca School was an appropriate placement for R.P. but she also opined that an 8:1:1 class would be appropriate for R.P. "if it had children like [R.P.] and it had teachers who understood autism and had special ed training in autism and if there was a social skills curriculum . . . ." (Tr. 520, 522.)

26

Timothy Breslin, R.P.'s teacher at the Rebecca School for the 2011-2012 school year, testified that he did not believe an 8:1:1 program was appropriate for R.P. because R.P. required a program with teachers who are qualified to teach using the DIR methodology, and from his experience the 8:1:1 classes did not use that teaching methodology. (Tr. 573-74.)[11] Mr. Breslin testified that unless the proposed placement for R.P. used the DIR methodology, it would not be an appropriate placement for R.P. (Tr. 611.)

Stacey Minondo, the director of student placements for the district, testified about how placement decisions are made by the Department. (Tr. 729.) Ms. Minondo testified that placements are not decided based on a specific classification, but rather each class, regardless of the ratio, has students with "mixed abilities and mixed disabilities." (Tr. 740.) Although she was not the placement officer for R.P. (Tr. 749-50), Ms. Minondo explained that an 8:1:1 placement for a student with autism is not unusual (Tr. 742), and that a placement is decided by looking at the program ratio in the student's IEP, as

---

[11] Developmental Individual Differences Relationship Model ("DIR") is a "way of looking at the students and coming up with an individualized program that looks at their developmental level, their sensory processing and their ability to have relationships." See D.C., 2013 WL 1234864, at *6 n.15.

well as the cognitive level and the age level of the students in the proposed class.  (Tr. 749).

During the course of the due process hearing, counsel for T.G. attempted to introduce evidence about the appropriateness of the placement at P155M and whether the placement could implement the IEP.  (Tr. 166-67, 475-76.)  Counsel for the Department objected to this line of questioning as outside of the scope of the parent's due process complaint.  (Tr. 167-70, 176-83, 475-76.)  The IHO held that the parent had raised the issue of the placement in her due process complaint and therefore it was not improper to inquire about the specifics of the placement.  (Tr. 178-83.)

## 2.

On February 14, 2012, the IHO issued his Findings of Fact and Decision.  (See IHO Op.)  The IHO held that the Department had failed to offer R.P. a FAPE for the 2011-2012 school year.

The IHO held that the Department had committed procedural and substantive violations of the IDEA.  Procedurally, the IHO held that the CSE violated the IDEA by failing to conduct an FBA prior to the CSE meeting and by failing to "actually consider[]" the psychoeducational evaluation prepared by Dr. Nightingale in formulating the IEP.  (IHO Op. at 20-22.)  Substantively, the

IHO held that the IEP was inappropriate because it did not address R.P.'s social skills requirements with an explicit social skills curriculum and because the Department had failed to demonstrate that the 8:1:1 program would provide R.P. with meaningful educational progress.  (IHO Op. at 22-24.)  The IHO also held that the placement at P155M was inappropriate because R.P. would have been placed into a class with students classified as emotionally disturbed and mentally retarded, and because P155M had no elevator and R.P.'s classes were on the fourth floor.  (IHO Op. at 22-23.)

The IHO held that the Rebecca School was an appropriate placement and that the equities favored reimbursement.  (IHO Op. at 24-28.)  The IHO ordered the Department to reimburse T.G. for, or pay directly, the full tuition of $94,750 for the Rebecca School for the 2011-2012 school year.  (IHO Op. at 28.) The Department appealed the decision of the IHO to the SRO, arguing that the IHO had inappropriately considered issues that the plaintiff had failed to raise in her due process complaint and that the IHO was incorrect when he held that the Department had failed to provide R.P. with a FAPE, that the Rebecca School was an appropriate placement, and that the equities favored reimbursement.

The SRO reversed the decision of the IHO.  At the outset,
the SRO held that the IHO had improperly based his decision in
part on issues that were not raised in the plaintiff's due
process complaint:

> I find that the due process complaint notice does not
> allege facts regarding the parent's concerns about the
> lack of a social skills curriculum at the assigned
> school, the lack of elevator access at the assigned
> school, or the student's functional grouping in the
> assigned 8:1+1 special class, and cannot be reasonably
> read to include such allegations[.]  Moreover, there
> is no indication in the hearing record that the parent
> requested, or that the IHO authorized, a further
> amendment to the due process complaint notice to
> include these additional issues, and the hearing
> record [further] reflects that during the impartial
> hearing, the district's counsel objected to the
> consideration of any issues not raised in the parent's
> due process complaint notice[.]  Thus, the IHO should
> have confined his determination to the issues raised
> in the parent's due process complaint notice and erred
> in reaching these issues[.]

(SRO Op. at 8 (internal citations omitted).)  In a footnote, the
SRO also explained that T.G. had failed to cross-appeal the
IHO's decision to the extent that it did not address the
outdated classroom observation, the failure to conduct
additional evaluations prior to the CSE, the failure to consider
a more restrictive placement for the student, that the CSE was
improperly constituted, and the adequacy of the annual and
short-term goals.  (SRO Op. at 8 n.6.)  The SRO explained that
the parent's failure to raise these issues on cross-appeal from

30

the judgment of the IHO amounted to a waiver and the SRO refused
to address those objections further in his opinion.[12]   Therefore,
the SRO confined his consideration to three issues: (1) whether
the CSE had considered the 2009 evaluation by Dr. Nightingale;
(2) whether the failure to conduct an FBA was a procedural
violation that denied R.P. a FAPE; and (3) the appropriateness
of the 8:1:1 program for R.P.   The SRO reversed the IHO on each
ground.

   The SRO held that the CSE had adequately considered Dr.
Nightingale's 2009 evaluation in formulating the IEP.   (SRO Op.
at 13-14.)   The SRO also held that even assuming that the CSE

_____

   [12] Although the SRO held that the "social skills curriculum"
issue had not been raised in the due process complaint, she
nonetheless rejected on the merits the absence of such a
curriculum as grounds for the denial of a FAPE, explaining:

> The student's April 2011 IEP included a description of
> the student's needs related to social skills as well
> as the provision of annual goals, related services,
> and accommodations in the area of
> socialization . . . .   To address the student's social
> skills, sensory regulation needs, and pragmatic
> language skills, the IEP provided the student with
> counseling and speech-language services as well as a
> 1:1 crisis management paraprofessional to "facilitate
> engagement and negotiation with peers[.]"   The IEP
> also provided strategies to address the student's
> social skills . . . .   Based upon the foregoing, I
> find that the April 2011 IEP addressed the student's
> needs in the area of social skills.

(SRO Op. at 19 (internal citations omitted).)   The SRO's
reasoning demonstrates persuasively that the IEP was not
deficient for lack of a "social skills curriculum."

had failed adequately to consider evaluative data during the
CSE, any procedural shortcoming did not rise to the level of a
material violation of the IDEA because "the parent had the
opportunity to meaningfully participate in the development of
the student's IEP . . . ." (SRO Op. at 14.)

The SRO next held that the CSE adequately addressed R.P.'s
behavioral issues in the IEP and in the BIP and therefore the
Department's failure to conduct an FBA prior to the CSE meeting
did not deny R.P. a FAPE. (SRO Op. at 17-18.)  The SRO relied
on testimony by Ms. Fochetta that R.P.'s special education
teacher at the Rebecca School and T.G. had actively contributed
to the modifications to R.P.'s BIP  and that R.P.'s behavioral
needs were discussed during the CSE meeting.  (SRO Op. at 17-
18.)  The SRO held that "the hearing record does not support a
finding that the student was denied a FAPE, where the April 2011
CSE addressed the student's behavioral needs and formulated a
BIP based on information and documentation provided by the
student's providers, and developed management needs designed to
target the student's interfering behaviors."  (SRO Op. at 18.)

The SRO also reversed the IHO's finding that the 8:1:1
program was inappropriate for R.P.  (SRO Op. at 18-19.)  The SRO
explained that the testimony by Ms. Fochetta supported the
conclusion that the CSE recommended the 8:1:1 program with a 1:1

crisis management paraprofessional based on the evaluations of R.P.'s needs.  (SRO Op. at 18.)  The SRO stated that the CSE had rejected the 12:1:1 and 6:1:1 classes as too large and too restrictive respectively, and according to Ms. Fochetta, the CSE had agreed at the time of the meeting that the 8:1:1 program with a dedicated paraprofessional was appropriate for R.P.  (SRO Op. at 18-19.)

Having reversed all of the IHO's findings in favor of the parent, the SRO did not reach the issues of whether the Rebecca School was an appropriate placement for R.P. or whether equitable considerations supported T.G.'s claim for payment of tuition.  (SRO Op. at 19.)

On August 8, 2012, the plaintiff filed a complaint in this Court.  The Complaint challenges the decision of the SRO and alleges violations of the IDEA, Section 504, and the New York State Education Law and Regulations.  The plaintiff moved for summary judgment on the IDEA claims on November 9, 2012.  On December 20, 2012, the defendant cross-moved for summary judgment dismissing the plaintiff's IDEA claims.

III.

A.

The plaintiff alleges that the Department violated the IDEA and demands payment of R.P.'s tuition for the 2011-2012 school year.  The Department claims that its actions comported with the IDEA.  Prior to addressing the merits of the present motions, a threshold issue is which of the plaintiff's claims are properly before the Court.  The plaintiff's brief is peppered with a number of purported procedural and substantive violations of the IDEA, made more confusing by the lack of a clear relationship between many of the plaintiff's section headings and the substance of the arguments within each heading.  The IHO held that several of the plaintiff's claims were preserved in the due process complaint whereas the SRO reversed and held they were waived.  The defendant argues that most of the plaintiff's claims were never raised in the due process complaint and others were waived by the plaintiff's failure to cross-appeal the denial of her claims by the IHO.

The plaintiff's grounds for relief can be divided into three categories: those that the defendant agrees are preserved; those that were not raised in the due process complaint and are waived; and one claim that was raised in the due process

34

complaint, was not addressed in the decisions of the IHO or SRO, and is now being asserted by the plaintiff.

The defendant agrees that the following three grounds for relief are properly before the Court: (1) the failure of the CSE to conduct an FBA prior to the CSE meeting; (2) the adequacy of the consideration of Dr. Nightingale's 2009 evaluation; and (3) the appropriateness of the 8:1:1 program for R.P.[13]   The merits of these claims will be addressed below.[14]

---

[13] There are a few additional arguments in T.G.'s papers that are essentially restatements of these claims and that are therefore preserved.  T.G. argues that the CSE "failed to recommend a special education class where [R.P.] is similarly situated," (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 23), and separately that she was not provided the opportunity to participate meaningfully in the CSE.  (Pl.'s Mem. at 18).  However the substance of these arguments is merely a restatement of the plaintiff's claim that the 8:1:1 class was inappropriate. (Pl.'s Mem at 26.)  Similarly, T.G. argues that the IEP was defective because it was "against the clear consensus of R.P.'s evaluators."  (Pl.'s Mem. at 25.)  However that claim overlaps with the arguments that the CSE did not adequately consider the evaluation of Dr. Nightingale and that the 8:1:1 program is not appropriate for R.P.

[14] Although not raised as an independent ground for relief in her papers, the plaintiff also argues that her inability to visit P155M was itself a procedural violation of the IDEA.  The plaintiff raised this claim at oral argument.  (Hr'g Tr. 10.)  However, "[the parents'] inability to visit the classroom to form an opinion as to its appropriateness is not itself a procedural defect."  S.F. v. N.Y.C Dep't of Educ., No. 11 Civ. 870, 2011 WL 5419847, at *13 (S.D.N.Y. Nov. 9, 2011); see also E.A.M. v. N.Y.C. Dep't of Educ., 11 Civ. 3730, 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012) ("[A] school district has no obligation to . . . allow a parent to visit a proposed school or classroom before the recommendation is finalized or prior to the school year.") (internal citation and quotation marks omitted);

The plaintiff asserts a number of arguments that were not raised in the due process complaint but were either raised before the IHO and SRO or for the first time here.  These grounds for relief will not be addressed because the Department did not have notice and an opportunity to attempt to remedy those alleged defects.  "An important feature of the IDEA is that it contains a statutory 30-day resolution period once a 'due process complaint' is filed." R.E., 694 F.3d at 187 (citing 20 U.S.C. § 1415(f)(1)(B)).  The due process complaint "must list all of the alleged deficiencies in the IEP" and "[t]he Department then has thirty days to remedy these deficiencies without penalty." Id. at 187-88; see also N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(i)(1)(iv) (providing that the due process complaint must include "a description of the nature of the problem of the student . . . including facts relating to such problem").  "If, at the end of the resolution period, the parents feel their concerns have not been adequately

---

B.P. v. N.Y.C. Dep't of Educ., 841 F. Supp. 2d 605, 614 (E.D.N.Y. 2012) ("[S]chool districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy. . . . [The District] fulfilled its legal obligations by providing the IEP before the first day of school." (quoting Cerra, 427 F.3d at 194)); Hanson v. Smith, 212 F. Supp. 2d 474, 487 (D. Md. 2002) ("There is no language in the IDEA requiring a school board to allow parents to visit the school of the proposed placement.").  Therefore, to the extent this argument is raised, it is without merit.

addressed and the amended IEP still fails to provide a FAPE,
they can continue with the due process proceeding and seek
reimbursement."  R.E., 694 F.3d at 188.

"The parent[] must state all of the alleged deficiencies in
the IEP in [the parent's] initial due process complaint in order
for the resolution period to function.  To permit [the parent]
to add a new claim after the resolution period has expired would
allow [her] to sandbag the school district.  Accordingly,
substantive amendments to the parent['s] claims are not
permitted."  R.E., 694 F.3d at 188 n.4; see also N.Y. Comp.
Codes R. & Regs. tit. 8, § 200.5(j)(1)(ii) ("[t]he party
requesting the impartial due process hearing shall not be
allowed to raise issues at the impartial due process hearing
that were not raised in the notice filed under subdivision (i)
of this section, unless the other party agrees otherwise.").

T.G. claims that the IEP was procedurally deficient because
the CSE failed to provide for parent counseling and that the IEP
was substantively defective because it did not provide for
behavioral interventions,[15] it failed to specify an appropriate
curriculum or methodology, and it failed to provide for R.P.'s

---

[15] T.G. argues under this claim that the 1:1 crisis management
paraprofessional was not appropriate for R.P. and that the IEP
failed to specify DIR as the only proper methodology for R.P.
(Pl's Mem. at 31.)

mobility limitations and physical therapy.  (Pl.'s Mem. at 31-
33.)  The Department sent the IEP to T.G. on May 11, 2011,
providing her with ample time to include all possible procedural
and substantive defects with the IEP.  (IEP at 2.)  However,
none of these claims were raised in the due process complaint
that T.G. filed on July 14, 2011.  Accordingly, these alleged
deficiencies were not properly raised in this action.

Moreover, T.G.'s claims that relate specifically to the
appropriateness of P155M and the ability of P155M to implement
the IEP were also not raised in the due process complaint.  T.G.
argues that P155M was inappropriate and unable to implement the
IEP because the "program would [not] provide R.P. with a FAPE,"[16]
the teacher was unfamiliar with R.P.'s needs, and the IEP did
not specify a class profile appropriate for his needs.[17]  These
grounds for relief were not raised in the due process complaint.
At the time T.G. submitted her due process complaint, she had
not yet visited P155M.  After she eventually visited P155M, T.G.
did not amend the due process complaint to assert these
additional grounds.  Therefore, because the claims with respect

---

[16] T.G. argues under this claim that the students in the proposed
placement at P155M would not have been similar to R.P.  (Pl.'s
Mem. at 23.)
[17] T.G. argues under this claim that the students in the proposed
placement at P155M would have been emotionally disturbed.
(Pl.'s Mem. at 28-29.)

to P155M were not raised in the due process complaint, the Department did not have a chance to respond to or remedy them, and they are not appropriate bases for relief in this action.

It is entirely appropriate not to consider these claims with respect to the plaintiff's specific objections to P155M. The plaintiff did not raise them in her due process complaint and therefore the Department did not have the opportunity to consider them and remedy any problem, including providing another designation or making any special accommodations at P155M.  To be clear, the lack of responsiveness at P155M in setting up a site visit for T.G. is deplorable.  A parent should be afforded the opportunity to object to a specific placement. See R.E., 694 F.3d at 191 ("[t]he Department's practice is to provide general placement information in the IEP . . . then convey to the parents a . . . FNR identifying a specific school at a later date.  The parents are then able to visit the placement before deciding whether to accept it.") (emphasis added).  However, "the requirement that an IEP specify the 'location' does not mean that the IEP must specify a specific school site.  The Department may select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP." R.E., 694 F.3d at 191-92 (internal citation, alteration, and quotation marks omitted).

Moreover, T.G. eventually went to the school unannounced and T.G.'s counsel suggested no reason why T.G. could not have simply gone earlier—at any time after she received the FNR on June 13, 2011.  (Tr. 12.)  She could then have included any specific complaints about P155M in her due process complaint that she filed on July 14, 2011.  As T.G.'s counsel conceded at oral argument, when T.G. visited P155 on October 12, 2011, one week before the due process hearing, the visit was not to determine the suitability of the placement and give the Department an opportunity to cure any defects.  (Tr. 11-12.) The Department was correct to describe this procedure as "sandbagging" and it is appropriate not to consider such arguments that were not raised in the due process complaint.

Furthermore, contrary to the decision of the IHO (Tr. 176-79), the plaintiff's catch-all allegations in her due process complaint that the program and/or placement were "inappropriate" did not preserve any of the plaintiff's specific claims about the placement at P155M because the allegations fail to inform the Department of a specific problem to be remedied.  Indeed the catch-all allegations could not have provided notice about specific deficiencies in P155M because the plaintiff had no such knowledge at the time she filed the due process complaint.  The due process complaint must list the alleged deficiencies with

40

enough specificity so that the Department is able to understand the problems and attempt to remedy them.  See R.E., 694 F.3d at 187-88.  The plaintiff's allegations that the program and/or placement were "inappropriate" are conclusory and fail to inform the Department of any specific issue with the IEP and/or P155M. Therefore, because the allegations were not specific enough for the Department to have the opportunity to remedy them, the claims the IHO held were preserved based on the catch-all allegation should not have been considered by the IHO or the SRO and are not a basis for relief in this action.  See R.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 269 (S.D.N.Y. 2012).

Finally, the plaintiff argues that the CSE failed to consider non-public placement options such as the Rebecca School.  This procedural argument was raised in the due process complaint but was not addressed in the IHO or SRO opinions.  The IHO granted the plaintiff relief on other grounds and did not address this argument, and the plaintiff failed to cross-appeal the issue to the SRO.

Courts disagree on whether it is appropriate to consider grounds for relief that were raised in the due process complaint, were not relied upon by the IHO, were not cross-appealed, but were asserted again in federal court.  Most judges

in this district have concluded that when an IHO rules in favor
of a parent on some grounds, but fails to reach other grounds
alleged in the parent's due process complaint, the parent's
failure to cross-appeal those issues to the SRO does not result
in their waiver.  See, e.g., FB v. N.Y.C. Dep't of Educ., No. 12
Civ. 1669, 2013 WL 592664, at *13-15 (S.D.N.Y. Feb. 14, 2013);
D.N. v. N.Y.C. Dep't of Educ., 905 F. Supp. 2d 582, 588
(S.D.N.Y. 2012) ("[T]he unaddressed claims are properly before
this Court and, indeed, may provide an alternative basis for
granting the Parent tuition reimbursement.") (citing R.E., 694
F.3d at 190); J.F. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2184,
2012 WL 5984915, at *9-10 (S.D.N.Y. Nov. 27, 2012).  However, at
least one judge has reached the opposite conclusion.  See C.F.
v. N.Y.C. Dep't of Educ., No. 11 Civ. 00157, 2011 WL 5130101, at
*12 (S.D.N.Y. Oct. 28, 2011) (holding issue that was not
mentioned by IHO in decision in favor of parent or cross-
appealed was waived).  Regardless of whether the claim is
properly before the Court, as discussed below, the CSE did not
commit a procedural violation of the IDEA and did not deny R.P.
a FAPE by failing to consider non-public placement options such
as the Rebecca School.  Having established the claims properly
before the Court, it is time to address the claims.

**B.**

The Supreme Court has established a two-part test to determine whether a party is entitled to reimbursement: (1) was the IEP proposed by the school district inadequate or inappropriate; and (2) was the private placement appropriate to the child's needs.  See Gagliardo II, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at 370).  If the two-part Burlington test is satisfied, the Court has discretion to consider relevant equitable factors in fashioning relief.  Id. (citing Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)).  "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing."  R.E., 694 F.3d at 184.[18]

Under the first prong of the Burlington test, a court must determine whether the IEP was inadequate or inappropriate.  In making this determination, courts engage in a two-part inquiry

---

[18] The Supreme Court has left open the question whether the states could place that burden on the District, even in cases where a parent challenges the IEP.  See M.H., 685 F.3d at 225 n.3.  However, when a federal court reviews the administrative decisions reviewing the IEP, this Court is bound to exhibit deference to those decisions.  Id.  Nothing in this case turns on which party bore the burden of proof in the state administrative proceeding because that issue would only be relevant if the evidence were in equipoise.  Id.  That is not the case here.  See M.W., 2013 WL 3868594, at * 1 n.1 (declining to determine if parents or Department of Education bears burden of persuasion on adequacy of IEP because evidence was not in equipoise).

"that is, first, procedural, and second, substantive." R.E.,
694 F.3d at 190; see also D.C., 2013 WL 1234864, at *11.  The
plaintiff alleges both procedural and substantive violations.


### 1. Procedural Adequacy of the IEP

"At the first step, courts examine whether there were
procedural violations of the IDEA, namely, whether the state has
complied with the procedures set forth in the IDEA." R.E., 694
F.3d at 190 (citation and internal quotation marks omitted).
Procedural violations only entitle a parent to reimbursement "if
they 'impeded the child's right to a [FAPE],' 'significantly
impeded the parents' opportunity to participate in the
decisionmaking process,' or 'caused a deprivation of educational
benefits.'" Id. (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).
"Multiple procedural violations may cumulatively result in the
denial of a FAPE even if the violations considered individually
do not." Id. (citing Werner v. Clarkstown Cent. Sch. Dist., 363
F. Supp. 2d 656, 659 (S.D.N.Y. 2005)); see also D.C., 2013 WL
1234864, at *11.  The plaintiff alleges that the CSE committed
procedural violations by failing to (1) conduct an FBA, (2)
consider the evaluation of Dr. Nightingale, and (3) discuss non-
public placement options such as the Rebecca School.  None of

44

these purported grounds for relief were material violations of
the IDEA.

### a. Failure to Conduct an FBA

T.G. argues that the CSE's failure to conduct an FBA denied
R.P. a FAPE.  Although the Department concedes that the CSE did
not conduct an FBA, it argues that the procedural violation did
not deny R.P. a FAPE.  The SRO held correctly that the failure
to conduct an FBA did not amount to the denial of a FAPE.  (SRO
Op. at 17-18.)

"New York regulations require the department to conduct an
FBA for a student 'whose behavior impedes his or her learning or
that of others.'"  R.E., 694 F.3d at 190 (quoting N.Y. Comp.
Codes R. & Regs. tit. 8 § 200.4(b)(1)(v)).  Notwithstanding this
requirement, it is clear that a "failure to conduct an FBA is a
procedural violation, but . . . it does not rise to the level of
a denial of a FAPE if the IEP adequately identifies the problem
behavior and prescribes ways to manage it."  R.E., 694 F.3d at
190 (citing A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent.
Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2009) (failure to perform
a FBA did not render IEP legally inadequate in light of IEP's
provision of strategies to address child's behavior)).  As the
Court of Appeals recently explained: "Failure to conduct an FBA,

45

therefore, does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." M.W., 2013 WL 3868594, *6; see also T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009); M.Z. v. N.Y.C. Dep't of Educ., No. 12 Civ. 4111, 2013 WL 1314992, at *8 (S.D.N.Y. Mar. 21, 2013); FB, 2013 WL 592664, at *9-11; T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 900 F. Supp. 2d 344, 354 (S.D.N.Y. 2012) ("The absence of an FBA will not render an IEP procedurally inadequate where . . . the IEP explicitly considers behavioral strategies to address the interfering behaviors.").

Ms. Fochetta testified that the CSE members "discussed the functions of [R.P.'s] behaviors at the meeting" and received input from R.P.'s mother and teacher. (Tr. 74-75, 116.)  T.G. also testified that the CSE "talked [at] length about how [R.P.'s behavior is] a concern and how much support he needs because of those behavioral issues . . . ." (Tr. 302.)  T.G. explained that she had helped to decide whether the BIP from the prior year should be amended for the 2011-2012 school year. (Tr. 678-80.)  Based on these discussions, the CSE slightly amended the 2010-2011 BIP, incorporated the new BIP into R.P.'s 2011-2012 IEP, and decided that R.P.'s behavior warranted the assistance of a 1:1 crisis management paraprofessional.  (Tr.

57.)  The resulting IEP provided R.P. with a 1:1 crisis management paraprofessional who would have provided benefits in addressing R.P.'s problematic behaviors.  See M.Z., 2013 WL 1314992, at *8.  Therefore, any deficiencies that resulted from the failure to complete an FBA were cured by the thorough discussion of R.P.'s behavior at the CSE, the BIP, and the IEP's provision of a full-time 1:1 paraprofessional.  See R.E., 694 F.3d at 190; M.Z., 2013 WL 1314992, at *8; T.M., 900 F. Supp. 2d at 354.  The SRO correctly concluded: "[T]he April 2011 CSE addressed the student's behavioral needs and formulated a BIP based on information and documentation provided by the student's providers, and developed management needs designed to target the student's interfering behavior." (SRO Op. at 18.)  Therefore, the decision of the SRO on this issue is entitled to deference.

### b. Consideration of Dr. Nightingale's 2009 Evaluation

The plaintiff also alleges that the CSE failed to consider Dr. Nightingale's 2009 evaluation when it formulated the IEP. The Department argues that the Nightingale evaluation was given sufficient consideration and moreover any deficiency did not deny R.P. a FAPE.  The SRO correctly held that the CSE sufficiently considered the 2009 evaluation of Dr. Nightingale. (SRO op. at 13-14.)

47

In developing an IEP, a CSE is required to "review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or state assessments, and classroom-based observations; and (iii) observations by teachers and related services providers . . . ." 20 U.S.C. § 1414(c)(1)(A). The CSE must consider "the results of the initial evaluation or most recent evaluation of the child." Id. § 1414(d)(3)(A)(iii). "New York state regulations also provide that the CSE 'must consider the results of the initial or most recent evaluation' in developing a student's IEP." E.A.M., 2012 WL 4571794, at *9 (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)).

However, "[b]oth the IDEA and New York law prohibit school districts from using a 'single measure or assessment as the sole criterion for determining . . . an appropriate educational program for the child.'" Id. (citing 20 U.S.C. § 1414(b)(2)(B); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(6)(v)). "The IDEA requires a school district to 'use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, in developing an IEP." Id. (quoting 20 U.S.C. § 1414(b)(2)(A)). "While the CSE is required to consider certain evaluative information from the child's parents and

48

teachers (or related service providers), the IDEA does not explicitly require that it consider all potentially relevant evaluations from the child's doctor." M.Z., 2013 WL 1314992, at *8 (citing 20 U.S.C. § 1414(c)(1)(A)); see also FB, 2013 WL 592664, at *8 (The IDEA "does not require that the team review every single item of data available"). Moreover, "although a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations." M.H. v. N.Y.C. Dep't of Educ., No. 10 Civ. 1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) (citations omitted); see also T.S. v. Bd. of Educ., 10 F.3d 87, 90 (2d Cir. 1993); Tarlowe v. N.Y.C. Bd. of Educ., No. 07 Civ. 7936, 2008 WL 2736027, at *7-8 (S.D.N.Y. July 3, 2008).

       In this case, although the CSE did not specifically discuss Dr. Nightingale's 2009 evaluation at the CSE meeting, the testimony of Rose Fochetta demonstrates that the evaluation of Dr. Nightingale was considered.  Ms. Fochetta testified that prior to the CSE she had read the entire evaluation of Dr. Nightingale and explained that although she was "familiar with the report" and it was a "good report," it was outdated and the CSE instead relied upon more timely information about R.P.  (Tr. 86-89.)  She testified that during the CSE meeting the Nightingale evaluation was "on the table" for any member of the

CSE, including the parent, to use toward formulating the IEP.
(Tr. 87-88.)  Furthermore, as the SRO noted, Ms. Fochetta
testified that Dr. Nightingale's evaluation was incorporated
into the 2010-2011 IEP, which was itself reviewed by the CSE in
2011 and used as a starting-point for the 2011-2012 IEP.  (SRO
Op. at 13; Tr. 87, 100.)  Therefore, the SRO's finding that Dr.
Nightingale's report was considered is supported by testimony at
the due process hearing and warrants deference.  See FB, 2013 WL
592664, at *6-8; Tarlowe, 2008 WL 2736027, at *7-8.

     Moreover, the SRO was also correct when she held that to
the extent the CSE may not have explicitly considered Dr.
Nightingale's evaluation, the failure to consider it
sufficiently did not amount to the deprivation of a FAPE.  (SRO
Op. at 14.)  The IDEA "does not require that the [CSE] team
review every single item of data available, nor has case law
interpreted it to mean such."  FB, 2013 WL 592664, at *6-8
(citations omitted).  Ms. Fochetta testified that the CSE relied
on more current input from Ms. Swope and from R.P.'s mother
rather than Dr. Nightingale's evaluation from about nineteen
months before the CSE meeting.  (Tr. 89.)  Furthermore, T.G.
testified that she participated "on every level" when the CSE
created R.P.'s IEP.  (Tr. 302, 668-74, 678-80.)  Therefore, any
procedural shortcoming by the CSE did not impede the parent's

50

ability to participate, deprive the student of educational
benefits, or impede the student's right to a FAPE.  See R.E.,
694 F.3d at 190.  The SRO's well-reasoned conclusion is entitled
to deference.

### c. Failure to Recommend Non-Public Placements

T.G. also alleged in her due process complaint and again in
her argument in this Court that the CSE's failure to discuss or
recommend private school options for R.P., including the Rebecca
School, was a procedural violation of the IDEA.  Although this
issue was not addressed by the IHO or SRO, it is without merit
and need not be remanded for further clarification.

A CSE is obligated to recommend a placement that would be
the "least restrictive environment" for the student.  20 U.S.C.
§ 1412(a)(5).  "The law requires the district to evaluate the
child's needs and to determine what is necessary to afford the
child a FAPE."  W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d
134, 148 (S.D.N.Y. 2006).  "If it appears that the district is
not in a position to provide those services in the public school
setting, then (and only then) must it place the child (at public
expense) in a private school that can provide those services."
Id.  "But if the district can supply the needed services, then
the public school is the preferred venue for educating the

child." Id. "Nothing in IDEA compels the school district to look for private school options if the CSE, having identified the services needed by the child, concludes that those services can be provided in the public school." Id.; see also A.D. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2673, 2013 WL 1155570, at *7-8 (S.D.N.Y. Mar. 19, 2013).

In this case, it is undisputed that the CSE did not consider non-public school placements for R.P. (Tr. 124-25.) However, the CSE determined that an 8:1:1 classroom with a 1:1 crisis management paraprofessional would be appropriate for R.P. only after rejecting more restrictive and less restrictive alternatives. Once the CSE determined that an 8:1:1 classroom was appropriate for R.P., it had identified the least restrictive environment that could meet R.P.'s needs and did not need to inquire into nonpublic programs. See A.D., 2013 WL 1155570, at *8. The CSE was under no obligation to discuss private placements with R.P. because the CSE reached the decision that there were less restrictive public placements that were appropriate for R.P. It was not a procedural error to omit any discussion of non-public placemen options.

## 2. Substantive Adequacy of the IEP

The plaintiff also alleges that contrary to the findings of SRO, the IEP was substantively deficient because the 8:1:1 ratio was not appropriate for R.P.'s unique educational needs.  The defendant argues that the IEP was appropriate.  The evidence in the record demonstrates that the designation of an 8:1:1 program with a 1:1 crisis management paraprofessional was appropriate, and the SRO's decision is entitled to deference.

After determining whether a proposed IEP is procedurally adequate, "[c]ourts then examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." R.E., 694 F.3d at 190 (internal citation and quotation marks omitted).  It is clear that a school district is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," Rowley, 458 U.S. at 199, but rather "fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130).  Thus, the education provided must be "sufficient to confer some educational benefit upon the handicapped child," Rowley, 458

U.S. at 200, but it need not "provide[ ] everything that might be thought desirable by loving parents."  Walczak, 142 F.3d at 132 (quotation omitted).

"[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."  M.H., 685 F.3d at 244.  The reviewing court "must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'"  Gagliardo II, 489 F.3d at 113 (quoting Walczak, 142 F.3d at 130).[19]

---

[19] Some of the material that was relied upon by the IHO and SRO was impermissible retrospective testimony.  "[T]he IEP must be evaluated prospectively as of the time of its drafting" and "both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." R.E., 694 F.3d at 186-87.  A substantively appropriate IEP may not be rendered inadequate through testimony by witnesses who did not appear before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE. See id. at 185; see also R.C., 906 F. Supp. 2d at 273 ("Given the Second Circuit's recent pronouncement that a school district may not rely on evidence that a child would have had a specific teacher or specific aide to support an otherwise deficient IEP, it would be inconsistent to require evidence of the actual classroom a student would be placed in where the parent rejected an IEP before the student's classroom arrangements were even made.").  At the due process hearing, Tina McCourt and Timothy Breslin testified that the 8:1:1 program was inappropriate for R.P.  However, these witnesses were not at the CSE, did not submit exhibits to the CSE, and this testimony was based in part on their views of the

The evidence and testimony from the CSE meeting amply support the SRO's decision that the 8:1:1 program with a 1:1 crisis management paraprofessional was sufficient for R.P. to make progress.  Ms. Fochetta testified that the CSE had discussed the various class room options and had reached a consensus decision that the 8:1:1 program with a 1:1 crisis management paraprofessional was appropriate for R.P.  (Tr. 37-38, 68, 91.)  T.G. similarly testified that the CSE had discussed multiple placement options, although she believed that it had settled on the 8:1:1 program "by default."  (Tr. 304-05.) T.G. also admitted that she did not object to the 8:1:1 ratio at the CSE meeting.  (Tr. 660.)  Dr. Nightingale testified that an 8:1:1 class would be appropriate for R.P. "if it had children like [R.P.] and it had teachers who understood autism and had special ed training in autism and if there was a social skills

substantive adequacy of the Rebecca School Program for R.P. for the 2011-2012 school year, which could not have been before the CSE in formulating the IEP for that same year.  In any event, their views that the 8:1:3 program at the Rebecca School was appropriate for R.P., while the IEP recommendation of a 8:1:1 program was not appropriate, present precisely the type of educational policy choice on which a court should defer to the well-reasoned decision of the SRO.  In contrast, Dr. Nightingale's evaluation was before the CSE and her testimony with respect to that evaluation and the propriety of the 8:1:1 with the 1:1 crisis management paraprofessional should be considered.  See R.E., 694 F.3d at 186 ("While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP.").

curriculum," (Tr. 522) although she was concerned about whether
an 8:1:1 designation by the Department of Education would be
appropriate.  The Rebecca School progress report indicated that
over the 2010-2011 school year, R.P. had been in an 8:1:3 class
and had made progress.  (Ex. 5 at 1.)  Based on this testimony,
the SRO's decision that the 8:1:1 program was substantively
appropriate for R.P. was supported by the evidence.

Nothing in the record before the CSE or the testimony
respecting the events of the CSE meeting suggests that the 8:1:1
program with a 1:1 crisis management paraprofessional was an
inappropriate placement decision for R.P.  No exhibits before
the CSE emphasized a different class ratio.  Although Carter
Swope testified that she did not believe that the 8:1:1 was
appropriate for R.P., her testimony was based on her presumption
that R.P.'s 8:1:1 class at P155M would have had students with
emotional disturbances, and did not address whether R.P. could
succeed in an 8:1:1 class generally.  (Tr. 421-22, 425.)
Because T.G. rejected the placement at P155M without attending
or visiting, Ms. Swope's speculative testimony about the
inappropriate composition of R.P.'s specific 8:1:1 class is not
an appropriate basis on which to reverse the SRO and to reject
the 8:1:1 program.  See R.E., 694 F.3d at 195 ("Speculation that
the school district will not adequately adhere to the IEP is not

56

an appropriate basis for unilateral placement."). Moreover, to the extent Ms. Swope's testimony has any persuasive force, it conflicts with Ms. Fochetta's testimony that the 8:1:1 program with a full time 1:1 crisis management paraprofessional was appropriate for R.P. (Tr. 38-39, 68, 91.) The SRO's decision that the 8:1:1 was appropriate should not be reversed based upon Ms. Swope's conflicting opinion that the 8:1:1 was not substantively adequate. See R.E., 694 F.3d at 192 ("The adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence . . . ."); Reyes v. N.Y.C Dep't of Educ., No. 12 Civ. 2113, 2012 WL 6136493, at *6 (S.D.N.Y. Dec. 11, 2012) ("[C]ourts are ill-equipped to choose 'between the views of conflicting experts on a controversial issue of education policy[.]'" (quoting Grim, 346 F.3d at 383)). Accordingly, because the SRO's determination that the faculty-student ratio in the IEP offered R.P. a FAPE was supported by sufficient evidence, the conclusion will not be disturbed.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, they are

57

either moot or without merit.  For the reasons explained above, the defendant's motion for summary judgment is **granted in part to the extent that the plaintiff's IDEA claims are dismissed**. The plaintiff's motion for summary judgment on the IDEA claims is **denied.  The Clerk is directed to close docket nos. 11, 12, and 17.**

SO ORDERED.

Dated:  New York, New York
        September 14, 2013                    _____/s/_____
                                                   John G. Koeltl
                                             United States District Judge